FILED
11/10/2022
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs August 1, 2022

## IN RE ELIJAH F.

**Appeal from the Juvenile Court for Davidson County**
**No. 2018-2919, PT256248      Sheila D. J. Calloway, Judge**

_____

### No. M2022-00191-COA-R3-PT
_____

In this case involving termination of the mother's parental rights to her child, the Davidson County Juvenile Court ("trial court") determined that several statutory grounds for termination had been proven by clear and convincing evidence. The trial court further determined that clear and convincing evidence established that termination of the mother's parental rights was in the child's best interest. The mother has appealed. Having determined that three of the statutory grounds were not supported by sufficient findings of fact and conclusions of law, we reverse the trial court's judgment with respect to the grounds of abandonment by an incarcerated parent by failure to support, abandonment by exhibiting wanton disregard for the child's welfare prior to incarceration, and failure to manifest an ability and willingness to assume custody of or financial responsibility for the child. We affirm the trial court's judgment in all other respects, including the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, Brittany F.

Jennifer L. E. Williams, Springfield, Tennessee, for the appellees, Dale F. and Wendellyn F.

## OPINION

### I. Factual and Procedural Background

Dale F. ("Grandfather") and Wendellyn F. ("Grandmother") (collectively, "Grandparents"), the maternal grandparents of Elijah F. ("the Child"), filed a petition in the trial court on March 11, 2020, seeking termination of the parental rights of Brittany F. ("Mother") and Elijah N. ("Father")[1] to the Child. The trial court had adjudicated the Child dependent and neglected in an "Order of Adjudication and Disposition" entered in March 2019. Therein, the trial court related that the Child was born on November 3, 2017, and had lived with both Mother and Father immediately after his birth until August 13, 2018, when DCS intervened upon receiving a referral alleging that the Child lacked supervision and had been exposed to illegal drugs by Mother and Father.

According to the trial court's order, upon DCS's receipt of the referral, law enforcement officers conducted a "welfare check on this family at a hotel." Upon arrival, the officers discovered that there was an outstanding warrant for Father's arrest and found drug paraphernalia "on the parents." Although Father admitted to the use of heroin, Mother denied using illegal drugs. Officers indicated that Mother's appearance was "indicative of a drug user." Both parents were taken into custody, beginning DCS's involvement with this family. On August 17, 2018, the trial court placed the Child in the temporary custody of Grandparents.

In their petition to terminate Mother's and Father's parental rights to the Child, Grandparents alleged several grounds for termination of Mother's parental rights, including: (1) abandonment by failure to visit, pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i); (2) abandonment by failure to support, pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i); (3) failure to substantially comply with the requirements of her permanency plan, pursuant to Tennessee Code Annotated § 36-1-113(g)(2); (4) persistence of the conditions that led to removal of the Child, pursuant to Tennessee Code Annotated § 36-1-113(g)(3); and (5) failure to manifest an ability and willingness to assume legal or physical custody of or financial responsibility for the Child, pursuant to Tennessee Code Annotated § 36-1-113(g)(14). In an amended petition filed on April 15, 2021, Grandparents withdrew the first two abandonment grounds alleged in the original petition and added the following grounds: abandonment by failure to visit during the four months prior to Mother's incarceration, abandonment by failure to support during the four months prior to Mother's incarceration, and abandonment by engaging in conduct prior to incarceration exhibiting a wanton

---

[1] The trial court entered a default judgment against Father after he had failed to file an answer to the termination petition and failed to appear for a hearing on September 1, 2020. Father has not appealed the court's decision and is not a party to this appeal. We will therefore limit our review to the trial court's termination of Mother's parental rights to the Child.

disregard for the Child, all pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv).[2]

After conducting a bench trial on October 14, 2021, the trial court entered a final order terminating Mother's parental rights to the Child on January 19, 2022. The trial court found clear and convincing evidence of the following statutory grounds for termination of Mother's parental rights: (1) abandonment by failure to visit, (2) abandonment by failure to support,[3] (3) abandonment by being "incarcerated willfully,"[4] (4) persistence of the conditions that led to removal of the Child from Mother's custody, and (5) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. The court determined that the ground of failure to substantially comply with the requirements of the permanency plan was inapplicable based on its finding that no valid permanency plan had been developed by DCS. Upon analyzing the best interest considerations in Tennessee Code Annotated § 36-1-113(i), the trial court determined that termination of Mother's parental rights was in the Child's best interest. Mother timely appealed.

## II. Issues Presented

Mother raises the following issues for this Court's review, which we have restated slightly as follows:

1.      Whether the trial court erred by finding clear and convincing evidence that Mother had abandoned the Child by willfully failing to visit him within the statutorily relevant four-month period.

2.      Whether the trial court erred by finding clear and convincing evidence that Mother had abandoned the Child by willfully failing to support him within the statutorily relevant four-month period.

---

[2] During trial, Grandparents explained to the trial court that the three grounds included in the amended petition were meant to replace the two abandonment grounds included in the original petition, and they consequently withdrew the two original abandonment grounds.

[3] The trial court's order does not specify whether its finding of the grounds of abandonment by failure to visit and abandonment by failure to support pertain to Tennessee Code Annotated § 36-1-102(1)(A)(i) or § 36-1-102(1)(A)(iv), the latter applying to a parent who has been incarcerated for all or part of the statutory four-month period. Mother, however, does not argue that the trial court considered the incorrect statutory grounds of abandonment, and the trial court expressly found in its order that Mother had been incarcerated for periods of the four months preceding the petition's filing. Thus, we will review the court's findings as if applied to the proper statutory grounds of abandonment by an incarcerated parent pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv).

[4] The trial court's finding that Mother had been willfully incarcerated presumably refers to the abandonment ground of exhibiting wanton disregard for the Child's welfare prior to incarceration.

3.    Whether the trial court erred by finding clear and convincing evidence that Mother had abandoned the Child by engaging in conduct that exhibited a wanton disregard for the Child's welfare prior to her incarceration.

4.    Whether the trial court erred by finding clear and convincing evidence that the conditions that led to the Child's removal from Mother's custody persisted.

5.    Whether the trial court erred by finding clear and convincing evidence that Mother had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.

6.    Whether the trial court erred by finding clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

Grandparents add an additional issue, restated slightly as follows:

7.    Whether the trial court erred by finding insufficient evidence that Mother had failed to substantially comply with a permanency plan.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96,

97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).
>
> * * *
>
> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV.  Statutory Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2022) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Inasmuch as Mother has challenged the trial court's findings and conclusions as to each statutory ground, we will address each ground in turn.

A.  Statutory Abandonment

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2022) provides as relevant to this action:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

The version of Tennessee Code Annotated § 36-1-102(1)(A) (2020) in effect when the instant action was filed provided the following definitions of abandonment as pertinent here:

> (iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
>
> > (a) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;
> >
> > (b) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of non-incarceration immediately preceding the filing of the action; or
> >
> > (c) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.][5]

1. Abandonment by Incarcerated Parent
Pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv)

We begin our review of the grounds of abandonment by failure to visit and failure to support by addressing the applicable four-month determinative period as outlined in the statute. In their original petition, Grandparents asserted abandonment grounds for failure to visit and failure to support pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(i), which applies to the four months immediately preceding the filing of the termination petition and does not apply to parents who are incarcerated during all or part of the four-month period. Upon learning that Mother had been incarcerated for part of the four-month period, Grandparents filed an amended petition alleging the proper statutory grounds for abandonment by failure to visit and failure to support when the parent is incarcerated

---

[5] Effective April 29, 2022, Tennessee Code Annotated § 36-1-102(1)(A)(iv)(c) has been amended to state: "With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]" *See* 2022 Tenn. Pub. Acts, Ch. 937, § 17 (H.B. 2070).

during all or part of the four-month period pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv).

The trial court, however, incorrectly determined that the relevant four-month period began on January 15, 2021, and ended on April 15, 2021. The court's determination only amounts to a three-month period and was erroneously predicated upon the filing of Grandparents' amended termination petition on April 15, 2021. This Court has previously clarified that "where an 'amendment' to a termination petition d[oes] not constitute a separate and distinct petition, the proper four month period to consider [i]s the four months preceding the filing of the original petition, not the amendment." *In re Chase L.*, No. M2017-02362-COA-R3-PT, 2018 WL 3203109, at *9 (Tenn. Ct. App. June 29, 2018); *see In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *5 (Tenn. Ct. App. July 22, 2020) ("As this amended petition was not a 'separate and distinct' petition from the original . . . the proper period to consider abandonment was . . . the four months preceding the filing of the original petition."). In this case, the amended petition was not a "separate and distinct" petition from the original given that Grandparents clarified within the amended petition that it did not supersede but rather served to amend the original petition. *See In re Braelyn S.*, 2020 WL 4200088, at *5. Moreover, the amended petition corrected the errors in the first petition by considering Mother's periods of incarceration during the four-month period preceding the original petition. Ergo, the four-month statutory period should have been based upon the date the original petition was filed.

Furthermore, although Grandparents stated in the amended petition that Mother had failed to visit and failed to support the Child during an aggregate total of four months immediately preceding her incarcerated periods and the filing of the petition, the trial court did not piece together a 120-day period in which Mother was not incarcerated. *See In re Travis H.*, No. E2016-02250-COA-R3-PT, 2017 WL 1843211, at *9 (Tenn. Ct. App. May 5, 2017) ("[T]he trial court was required to determine the four-month period by piecing together Father's periods of non-incarceration prior to the filing of the termination petition."). In accordance with Tennessee Code Annotated § 36-1-102(1)(A)(iv)(b), when a parent is incarcerated during part of the four-month period immediately preceding the filing of the termination petition, courts should consider the first 120 days of nonincarceration immediately preceding the filing of the petition.[6]

Therefore, the trial court should have considered the first 120 days during which Mother was not incarcerated preceding March 11, 2020, the filing date of the original petition. In its final order, the court determined that Mother had been incarcerated from July 18, 2019, through January 16, 2020. Thus, counting backwards from March 10, 2020, *see In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct.

---

[6] On appeal, Grandparents concede that the trial court erred in calculating the determinative period based on the filing date of the amended petition and in failing to aggregate the periods of Mother's nonincarceration. However, Grandparents contend that these errors were harmless.

App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing), to January 17, 2020, establishes a period of fifty-four days during which Mother was not incarcerated. Mother was also incarcerated from May 17, 2019, through May 29, 2019. Therefore, the next period of nonincarceration would have been May 30, 2019, to July 17, 2019, creating a period of forty-nine days during which Mother was not incarcerated. Prior to her incarceration in May 2019, Mother had not been incarcerated since November 16, 2018. Thus, the final period of nonincarceration that the trial court should have considered would have been April 30, 2019, to May 16, 2019, amounting to seventeen days. Therefore, the relevant, aggregated four-month statutory period for the abandonment grounds of failure to visit and failure to support would be April 30, 2019, to May 16, 2019; May 30, 2019, to July 17, 2019; and January 17, 2020, to March 10, 2020 ("Determinative Period").

Although the trial court did not calculate the correct Determinative Period, this Court has previously concluded that a court's "miscalculation of the relevant four-month period can be considered harmless when the trial court made sufficient findings of fact that encompassed the correct determinative period," *see In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *9 (Tenn. Ct. App. Jan. 31, 2019), and when the court's "findings of fact and conclusions of law include sufficient information to consider the correct four-month period," *see In re Braelyn S.*, 2020 WL 4200088, at *5. In the present case, the trial court included within its final order the periods of Mother's incarceration, which has rendered the correct Determinative Period ascertainable by this Court. We will now consider whether the trial court made sufficient findings of fact to encompass the Determinative Period with respect to the abandonment grounds of failure to visit and failure to support.

a. Failure to Visit

In its final order, the trial court found that Mother had engaged in "no meaningful visitation with the child since the fall of 2018." Given that the court's finding as to the abandonment ground included a three-year period spanning and encompassing the Determinative Period, we conclude that the court's miscalculation of the applicable four-month statutory period constituted harmless error. In addition, upon careful review of the record, we conclude that the evidence does not preponderate against the court's determination that there had been no meaningful visitation between Mother and the Child in over three years.

During trial, Mother acknowledged that she had not visited the Child in several years and that she had not seen the Child since he was an infant. By the time of the trial, the Child was nearly four years old. Mother testified that in the three years since the Child had been in Grandparents' custody, she had visited the Child once when the Child was still an infant. Grandmother testified that Mother had only visited the Child one time since

Grandparents had obtained custody, which visit occurred in October 2018, well before the beginning of the Determinative Period.

On appeal, Mother contends that her failure to visit the Child was not willful inasmuch as the trial court suspended Mother's visitation when it entered its Order of Adjudication and Disposition on March 21, 2019.[7] In its order, the trial court provided that Mother would not have any contact with the Child until she presented herself before the court so that it could decide whether visitation would be in the Child's best interest. Mother also argues that she attempted to visit the Child by filing a motion to dissolve the no-contact order and request visitation on March 19, 2021, nearly two years after the no-contact order had been implemented.

With respect to a parent's willfulness in failing to visit or financially support, Tennessee Code Annotated § 36-1-102(1)(I) (Supp. 2022) provides:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

As previously explained by this Court, "willfulness" does not require the same standard of culpability as is required by the criminal code, and it does not require "malevolence or ill will." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). Rather "[w]illful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent," and such conduct is the "product of free will rather than coercion." *Id.*

Mother's postulate that she did not willfully fail to visit the Child due to the no-contact order is unavailing. Our Supreme Court has previously addressed similar facts in which a father advanced the position that he did not willfully fail to visit his children due to existence of an order suspending his visitation rights. *See In re Adoption of Angela E.*, 402 S.W.3d 636, 642 (Tenn. 2013). The High Court rejected the father's argument and

---

[7] Although Mother failed to file an answer to either one of Grandparents' petitions, we determine that this affirmative defense was "tried in this case by implied consent." *See* Tenn. R. Civ. P. 15.02 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."); *see, e.g.*, *In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *7 (Tenn. Ct. App. Jan. 31, 2020). Much of the testimony during trial involved Mother's ability to visit the Child due to the trial court's no-contact order. In addition, Mother included the affirmative defense in her proposed order, and Grandparents address Mother's argument without raising the specter of waiver on appeal. *See id.*

concluded that the prior order suspending the father's visitation rights did not preclude a finding that he had willfully failed to visit the children. *Id.* The Court's conclusion was based upon the fact that the father had failed to visit the children for nearly three years at the time the termination petition was filed, he had taken no steps to have his visitation rights reinstated beyond filing a petition to reinstate visitation, and he had not attempted to visit his children until after the termination petition had been filed. *Id.* Ultimately, the Court concluded that "this is not a case in which a parent was actively trying to maintain visitation." *Id.*

Similarly, in the case at bar, Mother waited until two years after the Order of Adjudication and Disposition had been entered and a year after Grandparents had filed the termination petition to initiate her petition to dissolve the no-contact order and to reinstate her visitation rights. Although Mother was not present at the hearing during which the trial court issued its no-contact order, Mother testified that Grandmother had informed her of the no-contact order. Mother added that she did not believe Grandmother until her court-appointed attorney validated Grandmother's information after the termination petition had been filed and the Determinative Period had concluded. Nevertheless, Mother could have accessed court records to inquire about the no-contact order and its conditions for reinstatement of visitation upon learning of it from Grandmother. *See In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845, at *6 (Tenn. Ct. App. June 30, 2014) ("If, however, as Father asserts, he knew that the order of protection had been entered against him, it follows that he at least knew which court had entered it and certainly could have accessed that court record to discover the expiration date.").

Alternatively, if Mother did not know which court to contact, Mother at the very least could have communicated with DCS to inquire about the no-contact order and its conditions. According to Mother's sister, Ashley G. ("Aunt"), DCS had contacted her multiple times attempting to reach Mother. Aunt eventually achieved contact with Mother through Facebook and informed Mother that she needed to communicate with DCS. Aunt testified that Mother retorted that she "did not need to work through DCS to get her children back." Aunt testified that she instructed Mother that DCS wanted to help her establish a relationship with the Child but that Mother was "adamant that she did not have to do that." Based on Aunt's testimony, Mother knew DCS had been attempting to contact her and purposefully chose to disregard this information.

Moreover, when asked at trial whether she knew court proceedings concerning the Child were ongoing, Mother answered affirmatively, and when questioned as to whether she ever went to the court to retrieve a copy of "anything dealing with" the Child, Mother responded: "No. He was with my parents. I did not think it was going to come to this. Like I thought that everything was going to eventually work itself out originally when this all happened." Accordingly, we determine that Mother has failed to demonstrate that she was actively attempting to maintain visitation with the Child.

We therefore cannot conclude that Mother actively attempted to maintain visitation with the Child or that the trial court's order suspending her visitation rights rendered her failure to visit involuntary, particularly given the fact that Mother merely needed to present herself to the court in order for the court to reconsider its suspension of her visitation rights. Consequently, inasmuch as Grandparents have demonstrated that Mother failed to visit the Child during the Determinative Period, we conclude that the record contains clear and convincing evidence supporting this statutory ground of abandonment.

### b. Failure to Support

With respect to the statutory abandonment ground of failure to support, pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv), the trial court determined:

> Mother has provided no financial support for the child since placement with [Grandparents]. The mother testified that she is currently employed and has a stable source of income. However, she has failed to provide any support to [Grandparents].

On appeal, Mother contends that when she inquired whether Grandparents "needed any assistance for [the Child] [Grandparents] always refused." In addition, Mother posits that she "attempted to send Christmas gifts and letters, but [Grandparents] have failed to provide them to [the Child]."[8]

Relevant to this ground, the trial court determined that Mother had provided no financial support during the three-year period Grandparents had maintained custody of the Child. However, the court did not include findings of fact or conclusions of law addressing Mother's affirmative defense of lack of willfulness. Specifically, the court failed to address Mother's contention that Grandparents made her "feel" as though they would not accept her offers of support. Considering that Mother raised the affirmative defense of lack of willfulness during trial and in her proposed order, the court should have concluded in its final order whether Mother carried her burden to establish by a preponderance of evidence that she did not willfully fail to support the Child during the Determinative Period. *See* Tenn. Code Ann. § 36-1-102(1)(I). We therefore must reverse the court's finding of this statutory ground of abandonment.

---

[8] We again note that Mother failed to file an answer to either one of Grandparents' petitions and, thus, did not raise lack of willfulness as an affirmative defense to this statutory ground of abandonment. We, however, determine that this affirmative defense was "tried in this case by implied consent." *See* Tenn. R. Civ. P. 15.02; *see, e.g.*, *In re Serenity S.*, 2020 WL 522439, at *7. Mother testified during trial that Grandparents made her feel as though she could not assist them financially and that often she could not achieve contact with them. In addition, Grandmother responded to Mother's claim, testifying that she and Grandfather never prevented her from providing child support to them. Furthermore, Mother provided this defense in her proposed order, and Grandparents addressed Mother's argument without raising the issue of waiver on appeal.

c. Wanton Disregard

Concerning the statutory ground of wanton disregard, Tennessee Code Annotated § 36-1-102(1)(A)(iv)(c) provides:

> (iv)   A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
>
> * * *
>
> (c)   Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

With reference to this termination ground, this Court has previously explained:

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. Taxonomy of Children's Rights, 11 WM. & MARY BILL RTS. J. at 958. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S.*, 182 S.W.3d at 866 (footnote omitted) (emphasis added). Moreover, this Court has stated that "probation violations, repeated incarceration, criminal behavior,

substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

Although the trial court made some findings of fact that would be relevant to this statutory ground of abandonment, the court never explicitly concluded that it found clear and convincing evidence to establish that Mother had abandoned the Child by exhibiting wanton disregard for the Child's welfare prior to her incarceration. In fact, the court failed to mention the phrase, "wanton disregard," in its order. The court merely concluded that Mother had abandoned the Child "in that she has been incarcerated willfully" during the four consecutive months prior to the filing of Grandparents' petition. This conclusion is insufficient in that it does not address Mother's pre-incarceration conduct or whether that conduct exhibited a wanton disregard for the Child's welfare. We therefore cannot conclude that the trial court provided sufficient findings of fact or conclusions of law to affirm this ground for termination.

### B. Failure to Substantially Comply with Permanency Plan

The trial court determined that Grandparents failed to prove the statutory ground of substantial noncompliance with a permanency plan by clear and convincing evidence. In making this determination, the court noted that the Child had been in foster care for a few days before Grandparents obtained custody of him on August 18, 2018, and that a "valid permanency plan was never developed by DCS as defined by the statute." On appeal, Grandparents contend that Mother's admission during trial that she did not complete any of the purported tasks of the plan is sufficient evidence to support a finding of this ground. We disagree.

In order to prove the ground of substantial noncompliance with a permanency plan, "it is essential that the plan be admitted into evidence." *See In re T.N.L.W.*, No. E2006-01623-COA-R3-PT, 2007 WL 906751, at *4 (Tenn. Ct. App. Mar. 26, 2007). This Court has unequivocally explained that "the permanency plan must be admitted into evidence before the trial judge can consider it and it must be properly included in the record on appeal before we can consider it." *Dep't of Children's Servs. v. D.W.J.*, No. E2004-02586-COA-R3-PT, 2005 WL 1528367, at *3 (Tenn. Ct. App. June 29, 2005). Moreover, testimony alone cannot provide the clear and convincing evidence required to prove this termination ground.

In *In re T.N.L.W.*, this Court elucidated:

> As in *D.W.J.*, a case worker in this case testified as to some of the requirements of the plan. This is not sufficient. The permanency plan must be introduced into evidence in a case where termination is sought on ground

- 14 -

of substantial noncompliance with the plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

*In re T.N.L.W.*, 2007 WL 906751, at \*5. Therefore, the fact that Mother may have acknowledged during trial that she did not accomplish purported goals of the permanency plan cannot be relied upon by Grandparents to establish this statutory ground. Inasmuch as the permanency plan was not admitted into evidence during trial, we conclude that the trial court properly determined that insufficient evidence supported this ground.[9]

### C. Persistence of the Conditions Leading to the Child's Removal

The trial court found that clear and convincing evidence supported the ground of persistence of the conditions that led to removal of the Child from Mother's home or physical or legal custody. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (Supp. 2022) provides:

(A)     The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

    (i)      The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

    (ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

    (iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

---

[9] A review of the transcript of the evidence reveals that Grandparents attempted to present as evidence what they called a permanency plan. However, the trial court sustained Mother's objection to its admittance because Mother played no part in its development or creation and therefore would be unable to authenticate it. Grandparents do not challenge the trial court's ruling on appeal, and we will therefore not review this evidentiary ruling.

- 15 -

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Mother argues that the conditions that led to the Child's removal were no longer present or were likely to be remedied at an early date at the time of the trial. In support, Mother cites her testimony that she no longer was using illegal drugs by the time of trial and that she had maintained stable housing and employment for several months prior to the trial.

In its final order, the trial court found that the Child had been removed from Mother's custody for more than six months as a result of drug exposure, lack of supervision, and incarceration and that these conditions continued to persist at the time of the trial. The court also noted that Mother had resided at ten to fifteen different locations during the Child's life, although at the time of trial she testified that she currently maintained stable housing and employment. With respect to Mother's history of illegal drug use, the court found that Mother had been "drug free for several months" but that this had been a recent change. Mother testified that as recently as June 2021, she had tested positive for amphetamines, methamphetamines, and suboxone. Consequently, the court determined that Mother's illegal drug use persisted since the Child's removal.

Concerning Mother's periods of incarceration, the trial court determined that Mother continued to be re-incarcerated on a number of occasions since the Child's removal and that she was most recently incarcerated in January and February of 2021. Ultimately, the court concluded that the conditions that led to the Child's removal persisted, that the Child would be subject to further abuse and neglect if returned to Mother, that there was little likelihood that the conditions would be remedied at an early date, and that the continuation of the parent/child relationship was diminishing the Child's chance of an early integration into a stable and permanent home. Following our thorough review of the record, we conclude that the evidence does not preponderate against the trial court's findings.

It is undisputed that the Child had been removed from Mother's custody for more than six months at the time of trial and that his removal had been due to drug exposure, lack of supervision, and the parents' incarceration. With respect to her illegal drug use, Mother's own testimony supported the trial court's conclusion that this condition persisted. Mother testified that the last time she had used illicit drugs was approximately eight weeks prior to trial. Mother candidly described her alternating periods of sobriety and relapse as a "roller coaster ride," demonstrating a level of unpredictability with respect to her recovery. She explained that the longest she had abstained from illegal drug use was six to eight months. In addition, as mentioned by the trial court, Mother had tested positive for illegal drugs as recently as June 2021. Thus, nearly three years after the Child's removal from her custody, Mother had not yet established a significant, lasting sobriety.

In reviewing the trial court's findings, we note this Court's previous instruction:

> [I]t is imperative for courts handling parental termination cases to view substance abuse realistically. The power of various addictive substances over the addict has been acknowledged by this Court. *See, e.g.*, *In re: M.J.M.*, No. M2004-02377-COA-PT, 2005 WL 873302, at *10 (Tenn. Ct. App. April 14, 2005) (". . . we must accurately understand this challenge [the mother] faces to overcome her methamphetamine addiction. Methamphetamine is powerfully addictive. It has one of the highest recidivism rates of all abused substances.") (citation omitted). Recovery from addiction will frequently entail "false starts and set backs, as well as successes and, regrettably, backsliding." *Id.* at *11. Parents who suffer from addiction "can turn their lives around," but must be given the time and opportunity to do so. *In re: D.J.R.*, No. M2005-02933-COA-R3-JV, 2007 WL 273576, at *5-6 (Tenn. Ct. App. Jan. 30, 2007) (citing *Ray v. Ray*, 83 S.W.3d 726, 734 (Tenn. Ct. App. Jan. 30, 2007)).

*In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *12 (Tenn. Ct. App. June 16, 2011).

In this case, Mother testified that she had taken steps to address her illegal drug use. Mother related that she had completed a drug rehabilitation program at a facility named, "Buffalo Valley," in September or October of 2018. She also stated that she had received drug addiction treatment through Vanderbilt's Center for Women's Health ("Vanderbilt") after she was released from jail in November 2020. She participated in treatment at Vanderbilt throughout her entire pregnancy with her third child but ceased once she gave birth on March 29, 2021. After "losing contact with Vanderbilt," she proceeded "downhill" again, and her third child was removed from her custody a few months following her birth due to Mother's "unstable living" and relapse into illegal drug use. After DCS gained custody of her third child, Mother began another drug rehabilitation program known as "Cedar's Recovery." Mother testified that she had been excelling in the program and had been meeting with a counselor through the program on a bi-weekly basis. Since starting the Cedar's Recovery program, Mother had relapsed into drug use once.

Although we commend Mother for her perseverance and continued efforts to maintain sobriety, a pattern of relapsing drug use remains a problem for Mother. When considering that she had three years to achieve and maintain sobriety, we cannot conclude that she has been afforded insufficient time to turn her life around or that eight weeks of sobriety constitutes a remedy to this condition. *See In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016) ("While this Court has previously recognized that '[r]ecovery from addiction will frequently entail "false starts and set backs, as well as successes and, regrettably, backsliding,"' Mother has shown that it is uncertain if she will ever be able to stop abusing cocaine, let alone in the near future."); *see also In re J.C.D.*, 254 S.W.3d 432,

442 (Tenn. Ct. App. 2007) ("While we hope that these most recent efforts by Mother to overcome her drug dependency problem lead to a permanent resolution of her problem, they are insufficient to overcome the facts of her previous multiple relapses . . . .").

We also conclude that the evidence in the record does not preponderate against the trial court's findings related to Mother's repeated incarceration. Mother has been in and out of the Davidson County or Wilson County jails six different times during the three years since the Child was removed from her custody, and her most recent period of incarceration was January 12, 2021, through February 4, 2021, a mere nine months before the trial. During trial, Mother also reported that she had an upcoming criminal court hearing scheduled for November 14, 2021, to address the unresolved indictment issued in Wilson County. Thus, at the time of the trial, Mother continued to confront the possibility of re-incarceration.

Based upon our review of the record, we agree with the trial court that clear and convincing evidence established that the conditions leading to the Child's removal continued to persist at the time of trial. We accordingly affirm the trial court's determination of the existence of this statutory ground for termination.

### D. Failure to Manifest an Ability and Willingness to Assume Legal and Physical Custody of or Financial Responsibility for the Child

The trial court also found clear and convincing evidence supporting the ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (Supp. 2022) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, Grandparents were required to establish by clear and convincing evidence that (1) Mother failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

In its final order, the trial court delineated findings of fact related to Mother's failure to manifest an ability and willingness to assume custody of or financial responsibility for

the Child but made no such findings related to the essential element of risk of substantial harm. The court merely concluded that placing the Child back in Mother's custody would pose a risk of substantial harm to him but failed to provide specific findings of fact in support of this legal conclusion. This Court has previously emphasized that it is imperative for trial courts to enter an order with specific facts and conclusions of law, stating: "The absence of appropriate findings supporting this ground for termination is not a trivial concern. With respect to termination cases, the trial court is specifically directed by statute to 'enter an order that makes specific findings of fact and conclusions of law.'" *In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *13 (Tenn. Ct. App. Jan. 25, 2019) (quoting Tenn. Code Ann. § 36-1-113(k)); *see In re O.W.*, No. W2019-01127-COA-R3-PT, 2020 WL 97727, at *9 (Tenn. Ct. App. Jan. 9, 2020) ("There is no bright-line test by which to assess the sufficiency of factual findings, but 'the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue.'") (quoting *Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013)).

Notably, this Court has previously reversed a finding of the existence of this statutory ground when the trial court provided no findings of fact regarding why placing the subject children back in the parent's custody would pose a risk of substantial harm to their welfare. *See In re Nakayia S.*, No. M2017-01694-COA-R3-PT, 2018 WL 4462651, at *5 (Tenn. Ct. App. Sept. 18, 2018) (reversing the trial court because it "made no findings regarding why placing the Children back in Father's custody would risk substantial harm to their welfare"); *see also In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *9 (Tenn. Ct. App. Mar. 1, 2021) ("[A] finding that placing the child in the parent's custody would pose a risk of substantial harm to the child is a necessary component of the statutory ground."). Considering that the trial court in the case at bar did not include specific findings of fact to support its legal conclusion that returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare, we are compelled to reverse the court's judgment with respect to this statutory ground. *See In re Mickeal Z.*, 2019 WL 337038, at *13 (opting to reverse the judgment with respect to the deficient statutory ground rather than remand for the preparation of sufficient findings of fact when this Court's ultimate disposition includes the affirmance of the trial court's termination of the parent's rights).

## V. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d at 240)). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to

consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The version of Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) in effect when the termination petition was filed in the instant action listed the following factors for consideration:[10]

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

---

[10] Effective April 22, 2021, the General Assembly has amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, *inter alia*, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). However, because the termination petition in this case was filed prior to the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute are applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

- 20 -

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has instructed regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

Upon considering the statutory factors, the trial court in the instant action determined that clear and convincing evidence demonstrated that termination of Mother's parental rights to the Child was in his best interest. As for the first factor, the court found that Mother had struggled to maintain safe and stable housing, overcome her drug addiction issues, and remain out of jail throughout the life of the Child, despite having begun to make some recent adjustments to her circumstances. On appeal, Mother contends that she has adjusted her circumstances, conduct, and conditions. In support, Mother explains that she has maintained stable housing and employment for several months and has complied with the requisites of Cedar's Recovery program. Nevertheless, as previously noted, Mother acknowledged using illegal drugs as recently as eight weeks prior to trial and testified that she may face re-incarceration due to a pending criminal indictment. Accordingly, the evidence preponderates in favor of the trial court's findings concerning this factor.

With respect to the second factor, the trial court found that Mother had been unsuccessful in affecting a lasting adjustment to her life but determined that there had been no reasonable efforts made by any available social services agencies. The court, however, did not indicate whether this factor weighed in favor of or against termination. DCS's involvement with this case is unclear from our review of the record. Although DCS initiated the removal of the Child from Mother's custody, Grandparents maintained custody of the Child and initiated the termination of Mother's parental rights.

Nevertheless, Grandmother testified that DCS attempted to get in touch with Mother to develop a permanency plan and visited Grandparents' home to monitor the Child every week. Aunt also testified that DCS attempted to contact Mother multiple times. Considering the trial court's finding that no reasonable efforts had been made by available social services agencies and the lack of clarity in the record concerning DCS's role or efforts throughout the duration of Grandparents' custody of the Child, we cannot conclude that this factor weighs in favor of termination. Consequently, we determine that this factor should weigh against termination.

Concerning the third statutory factor, whether Mother has maintained regular visitation or contact with the Child, and the fourth factor, whether a meaningful relationship has been established between the two, the trial court found that neither regular visitation and contact nor a meaningful relationship between Mother and the Child had been established. In a previous section of this Opinion, we have affirmed the trial court's finding that Mother failed to visit the Child during the Determinative Period. Notwithstanding, Mother posits that she sent letters, a birthday card, and Christmas presents to the Child when she was incarcerated. In contrast, Grandmother testified that Mother "really didn't stay in contact much" and that she would typically only contact them when she needed money, was high, or was incarcerated. With respect to the regularity of Mother's letters, Grandmother indicated that the letters were sporadic, testifying that "sometimes they would come within a couple of weeks, and then after that, nothing." We conclude that the evidence does not preponderate against the trial court's finding related to Mother's lack of regular visitation or contact.

As relevant to the fourth factor, Aunt related that the Child has bonded to Grandparents and views them as his parents. Grandmother stressed that the Child has no relationship with Mother and does not even know who Mother is. Therefore, the evidence does not preponderate against the court's findings related to this factor.

As for the fifth factor, the trial court determined that a change of caretakers and physical environment likely would have a negative effect on the Child. The court stated that the Child was "extremely bonded" to Grandparents and "excelling in every respect in their care." Grandmother articulated that the Child had required medical treatment when they gained custody of him. Grandparents updated his immunizations and sought medical treatment for a problem with his hip. Grandmother further testified that the Child perceives her as his mother, and Aunt testified confirming the same. According to Grandmother, the Child was well-adjusted to their home and was stable and happy in their care and custody. Furthermore, Mother testified that she was not yet in a position to maintain custody of the Child as of the date of the trial. Thus, taking the Child from a secure and safe environment and returning him to Mother's unpredictable environment would certainly have a deleterious effect on the Child. The evidence does not preponderate against the court's findings regarding this factor.

Respecting the sixth factor, whether the Child had been subjected to abuse or neglect while in Mother's care, the trial court found that Mother had been the "perpetrator of neglect" by exposing the Child to her drug usage, not supervising the Child, and abandoning the Child. In the court's "Order of Adjudication and Disposition," it determined that the Child had been removed from Mother's custody when police conducted a "welfare check" at the family's hotel room and found drug paraphernalia in the parents' possession. As a result of the parents' apparent illegal drug usage and subsequent arrest, the court adjudged the Child to be dependent and neglected. Accordingly, we conclude that the evidence does not preponderate against the court's weighing of this factor in favor of termination.

Similarly, with respect to the seventh factor, the trial court found that Mother could not provide the Child with a safe and stable home environment due to her history of drug abuse. Although it considered that Mother had testified that she was "drug free" for several months, the court concluded that her history of drug abuse weighed heavily against her. We agree. As previously examined by this Court, Mother has not established a lasting sobriety, given her testimony that she had repeatedly relapsed in the three years since the Child's removal and had used illegal drugs as recently as eight weeks prior to trial. We thus conclude that the evidence does not preponderate against the trial court's findings with respect to this factor.

Concerning the eighth factor, the trial court merely concluded: "The mental and/or emotional status of the Mother would be detrimental to the child's health." The court provided no findings of fact to support this legal conclusion. We, therefore, are constrained to disagree with the court's weighing of this factor in favor of termination of Mother's parental rights.

Relative to the ninth factor, the court found that Mother had "failed to pay child support consistently with the child support guidelines promulgated by the Department." As we have previously concluded, the trial court made no findings regarding Mother's defense that her failure to pay was not willful. We therefore conclude that the ninth factor weighs neither for nor against terminating Mother's parental rights to the Child.

Upon careful review, we determine that the weight to be given to the second and eighth factors should militate against termination and that factor nine should weigh neither for or against termination. We otherwise affirm the trial court's determination that the remaining factors weighed heavily in favor of termination as well as its overall conclusion that clear and convincing evidence demonstrated that termination of Mother's parental rights to the Child was in the Child's best interest. By the time of trial, three years had elapsed during which Mother could have adjusted her conduct and circumstances, but instead she continued to struggle with relapsing illegal drug use. In addition, the possibility of her re-incarceration still loomed and must be accounted for in considering the best interest of the Child.

The Child had spent nearly his entire life in the custody of Grandparents, and the evidence established that the Child had bonded closely with them and considered them to be his parents. The Child had settled into a safe and healthy home environment while Mother continued in her efforts to turn her life around. After three years, the Child should not be forced to wait longer for permanence. We therefore agree with the trial court's determination that clear and convincing evidence established that termination of Mother's parental rights is in the best interest of the Child.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's determinations regarding abandonment by an incarcerated parent by failure to support, pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv)(b); abandonment by exhibiting wanton disregard for the Child's welfare prior to incarceration, pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv)(c); and failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child, pursuant to Tennessee Code Annotated § 36-1-113(g)(14). We affirm the trial court's judgment in all other respects, including the termination of Mother's parental rights to the Child. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Brittany F.

s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE